THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

| | |
|---|---|
| ALEXANDER M. McHALE, and ASHLEY N. McHALE, | ) ) ) |
| Plaintiffs, | ) ) CIVIL ACTION |
| vs. | ) FILE NO. _____ ) ) |
| CROWN EQUIPMENT CORPORATION, | ) ) |
| Defendant. | ) |

**COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL**

Plaintiffs Alexander M. McHale, and Ashley N. McHale, his wife, and file this Complaint for Damages as follows:

**PARTIES
and
STATEMENT REGARDING JURISDICTION**

1. Plaintiff Alexander McHale is a resident of Lakeland, Polk County, Florida and a citizen of the State of Florida.

2. Plaintiff Ashley McHale is a resident of Lakeland, Polk County, Florida and a citizen of the State of Florida.

3. Defendant Crown Equipment Corporation (hereinafter "Crown") is an Ohio Corporation, with its principal place of business in Ohio, and is registered to do business in Florida.

4. Defendant Crown advertises its products for sale to Florida customers, sells its products to Florida customers for use by Florida customers, and sold the subject forklift for use in Florida.

5. Defendant Crown committed a tortious act in Florida.

6. Defendant Crown can be served with process through its registered agent, CT Corporation System, 1200 South Pine Island Road, Plantation, FL 33324.

7. Defendant Crown has been duly and appropriately served with this lawsuit as allowed by law.

8. Venue is proper in this Court because the cause of action occurred in this state and in this district. Also, a portion of the alleged tortious acts and omissions, as well as the injury occurred in this state and district.

9. Plaintiffs are alleging general and special damages well in excess of $75,000.00 including general damages that include the loss of Alexander McHale's left leg below the knee, and related medical and life care needs. Therefore, the amount in controversy, exclusive of interest and costs, exceeds the sum or value of $75,000.00 specified by 28 U.S.C. §1332 conferring jurisdiction in this Court.

10. Pursuant to 28 U.S.C.A. § 1332, this Court has jurisdiction because Plaintiffs are citizens of a different state than Defendant, and there exists complete diversity among the parties.

## FACTS and GENERAL ALLEGATIONS

11. On March 27, 2015, Plaintiff Alexander McHale was operating a Crown RC5500 forklift ("the forklift") in the Amazon Fulfillment warehouse in Plant City, Hillsborough County, Florida.

12. On March 27, 2015, when Plaintiff Alexander McHale was operating a Crown RC5500 forklift in the Amazon Fulfillment warehouse in Plant City, Hillsborough County, Florida, he had a collision with a fixed object - racking.

13. On March 27, 2015, when Plaintiff Alexander McHale was operating a Crown RC5500 forklift in the Amazon Fulfillment warehouse in Plant City, Florida, and had a collision

with warehouse racking, his left leg was crushed between the forklift and the racking with which he collided (the "crash event").

14. During the crash event, Plaintiff Alexander McHale attempted to remain within the forklift's operator compartment, but could not, and as a result his foot got between the forklift and storage racks and was crushed.

15. As a result of the crush injuries suffered during the crash event, Plaintiff Alexander McHale's left leg was amputated below the knee.

16. Defendant Crown designed and manufactured the forklift being operated by Plaintiff McHale at the time of the crash event.

17. The forklift did not have a rear operator compartment safety door as standard equipment when designed and manufactured by Defendant Crown.

18. The forklift was designed and manufactured by Crown so that it had a brake under the operator's left foot that required McHale, as the operator, to lift his left foot off the brake pedal to operate the emergency braking system.

19. The most common injury causing mishap for standup forklift operators is left leg injuries suffered during collision events.

20. Given the laws of physics, when the forklift decelerates in response to the application of the emergency brake when the forklift is being operated in reverse, as it usually is in warehouse operations, to avoid a collision, the operator's body, in response to the deceleration of the forklift and his own continuing momentum, will continue to move rearward, in the direction of travel, and out of the operator's compartment, as the forklift slows.

21. It is foreseeable and expected by Crown that in response to the actual and expected forces experienced by the operator when the emergency brake is applied, during a rearward movement, that the operator will, despite training and personal expectations of the

operator to the contrary, broaden his base of stability to maintain his balance – even before his center of gravity goes outside his stability base.

22. It is foreseeable and expected by Crown that when an operator broadens his base of stability to maintain his balance – even before his center of gravity goes outside his stability base – that he will do so by moving his left foot to the left and that this will result in the operator's left foot leaving the safety of the operator's compartment and getting into harm's way where it can be injured in a collision with a fixed object.

23. When the emergency brake is applied on the subject forklift, the operator uses his left leg to release pressure on the brake pedal and allow the brake pedal to elevate and engage the brakes.

24. When the forklift decelerates in response to application of the emergency brake, the operator's weight is moved towards his left so as to cause his left foot to be his weighted foot.

25. There is not a brake under the operator's right foot in the subject forklift.

26. It would not negatively affect the utility of the subject forklift to have a brake pedal under the right foot that would be the primary brake pedal for stopping the forklift in emergency situations.

27. To safely operate the subject forklift, the operator should keep both feet on the floor of the forklift at all times when it is moving.

28. Having a brake pedal under both the right and left feet of the operator would insure that the operator's feet stay on the floor of the forklift during operation of the forklift.

29. Immediately prior to the crash event, Plaintiff Alexander McHale lifted his left foot off the brake pedal and this caused him to assume a position that challenged his perceived and actual balance, was likely to create a compensatory step to maintain balance and was likely

to create a scenario where he was likely to take actions to protect his body from impact by the use of his extremities.

30. Crown is aware that when a forklift designed like the subject forklift is involved in a collision the impending collision will cause the left leg of the operator, despite a desire and intention to comply with his training, to travel outside the confines of the operator's compartment into a zone of danger where it can be crushed by the forces of the collision between the forklift and whatever it hits.

31. The design of the subject forklift encourages the operator to unweight his left leg immediately prior to unexpected collisions as part of the process of using this emergency foot brake instead of keeping it firmly planted on the floor so that it can be used as the weight leg portion of the operator's base of stability.

32. Had the forklift been equipped with a brake pedal under both feet, and Plaintiff Alexander McHale trained by Crown's manuals and training materials to use his right foot as a brake, his left foot would have stayed firmly on the operator's platform, inside the operator's compartment and Plaintiff would not have been injured.

33. The forklift did not have a door or other device to prevent Plaintiff Alexander McHale's left leg from being allowed out of the confines of the operator's compartment during foreseeable challenges to which operators like Alexander McHale are subjected during collision events like this one.

34. When Plaintiff Alexander McHale' leg left the safety of the operator's compartment it was crushed between the forklift and a steel pole.

35. As a direct and proximate result of this incident, Plaintiff Alexander McHale sustained severe and permanent injuries, including, but not limited to, crush injuries that led to the amputation of his left leg below the knee.

36. Crown refuses to sell a safety door and actively discourages purchasers of standup forklift products from purchasing rear guard doors that protect operators from injury during mishaps like the crash event.

37. The owner of the forklift reasonably relied on Crown to provide advice and guidance to help it choose appropriate and safe forklift products with necessary safety features for use at the Amazon warehouse.

38. Defendant Crown intended for the forklift's owner to rely on the truthfulness and scientific veracity of its representations about the safety of the safety doors on standup forklifts in making its purchasing decisions.

39. When Crown represented to purchasers its positions relating to the safety associated with rear guard doors on standup forklifts, it knew that these representations were false and not supported by valid science.

40. Defendant is not aware of any documented study demonstrating that a door materially hinders or slows the operator's escape from the truck when escape is appropriate for safe use of the truck.

41. Defendant is not aware of any documented event involving a human operator in which a door on a forklift significantly increased the severity of injury in in a tip over or off the dock incident.

42. The accident reports Defendant relies upon as support for its reasons for not having safety doors on standup forklifts are not substantially similar in that none of the events relied upon involved standup forklifts with doors.

43. Defendant is not aware of any documented event involving a human operator where there was an amputation or serious injury to the operator's foot and/or leg as a result of a collision event involving a standup forklift with a safety door.

44. Defendant is not aware of any documented event involving a human operator where the operator was trapped or stuck by a damaged guard door or crushed by a collapsed door pushed into the compartment.

45. Defendant is not aware of any documented heat build-up in the operator compartment that has encouraged improper use of a guard door.

46. Defendant is not aware of any documented event in which a guard door served as a pinch or catch point for racking, product, the operator's body or clothing.

47. Defendant is not aware of any documented complaints or studies demonstrating that a guard door contributes to operator discomfort.

48. Defendant is not aware of any documented material increase in aisle width requirements and/or reduced operating clearances required by the use of a guard door.

49. A safety door can assist an operator in being aware of the confines of the operator compartment on the forklift.

50. Being aware of the confines of the operator compartment on the forklift can assist an operator in remaining safely in the confines of the operator compartment in crash events with fixed objects.

51. A safety door can protect an operator from left leg injury in the event of a crash event.

52. A rear safety door of a variety of designs, including but not limited to interlocking, spring loaded, latched, and magnetically controlled, would have protected Plaintiff Alexander McHale from injury during the crash event.

53. Because the forklift did not have a door or similar device Plaintiff Alexander McHale's left leg was not retained in the confines of the operator's compartment during the crash event and he was injured when his foot was crushed.

54. In addition to past and future medical and hospital expenses, Plaintiff Alexander McHale has also suffered a loss of earnings from the date of his injury to the date of trial; loss of future earning capacity from the date of trial over his work life expectancy; loss of function of his body from the date of his injury until the time of trial; loss of function of his body from the date of trial over his normal life expectancy; past physical and mental pain and suffering from the date of his injury to the date of trial; and future physical and mental pain and suffering over his normal life expectancy. Plaintiff's past and future physical pain and suffering includes, but is not limited to, unpleasant feelings, bodily distress or uneasiness, bodily suffering, sensations or discomfort. Plaintiff's past and future mental pain and suffering includes, but is not limited to, mental anguish, nervousness, worry, anxiety, irritability, disappointment, depression, confusion, disorientation, apprehension, embarrassment, loss of enjoyment of life, a feeling of uselessness, or emotional distress.

## COUNT ONE—STRICT PRODUCTS LIABILITY AGAINST DEFENDANT

55. Plaintiffs reallege and incorporate by reference each of the foregoing paragraphs of the Complaint as if they were fully restated verbatim herein.

56. Defendant designs, manufactures, markets, and sells forklifts for use and consumption, and Defendant designed, manufactured, marketed, and sold the subject forklift.

57. The subject forklift was defective at the time it was sold by Defendant Crown and at the time it left Defendant Crown's control.

58. The subject forklift was expected to reach the user without substantial change in the condition in which it was sold.

59. The subject forklift did reach the user without substantial change in the condition in which it was sold.

60. Plaintiff McHale was a person who would reasonably be expected to use or be affected by the subject forklift, and Plaintiff McHale used the subject forklift in a safe and/or foreseeable fashion.

61. Defendant is liable to Plaintiffs for its defective forklift product as follows:

   a. Crown sold and distributed the forklift;
   b. Crown was engaged in the business of selling and distributing the forklift;
   c. The forklift was in a defectively designed condition at the time it left Crown's control;
   d. The subject forklift was unreasonably dangerous to Plaintiff Alexander McHale as the user of the product;
   e. The subject forklift was unreasonably dangerous to Plaintiff Alexander McHale because it failed to perform as safely as an ordinary consumer would expect when used as intended or when used in a manner reasonably foreseeable by Crown and the risk of danger in the design outweighs the benefits;
   f. A reasonable alternative safer design in the form of a barrier preventing the operator's leg from leaving the compartment could have been practically adopted at the time of sale and distribution;
   g. A reasonable alternative safer design in the form of two brake pedals with the operator being trained to use the right pedal for emergency braking could have been practically adopted at the time of sale and distribution;
   h. The alternative design(s) would have reduced or avoided the foreseeable risks of harm posed by the forklift;
   i. The omission of the alternative design(s) rendered the forklift not reasonably safe;
   j. The alternative design(s) would have reduced or prevented Plaintiff Alexander McHale's harm;
   k. The design defect(s) were the cause of Plaintiff Alexander McHale's damages.

62. Defendant is liable to Plaintiffs for its defective forklift product that was not crashworthy and enhanced Alexander McHale's harm as follows:

    a.      There is a safer, practicable, alternative design in the form of a barrier preventing the operator's leg from leaving the compartment and two pedals that encourage the left foot to remain firmly on the floor of the forklift at all times;

    b.      Had the alternative design been used, the extent of the Plaintiff's injuries would have been reduced;

    c.      The design chosen by Crown allowed the injury to occur and it would not have had an alternative, safer practicable design been chosen.

63. As a direct and proximate result of the design defects in the subject forklift, Plaintiff Alexander McHale suffered bodily injury that is permanent within a reasonable degree of medical probability and resulting pain and suffering, disability, disfigurement, mental anguish, loss of capacity for the enjoyment of life, expense of hospitalization, medical and nursing care and treatment, loss of earnings, loss of the ability to earn money, and aggravation of a previously existing condition.

## COUNT TWO—PUNITIVE DAMAGES AGAINST DEFENDANT

64. Plaintiffs reallege and incorporate by reference each of the foregoing paragraphs of the Complaint as if they were fully restated verbatim herein.

65. Defendant is aware that hundreds of users of its similar forklifts, designed and intended exclusively for warehouse use have suffered lower extremity injuries as a result of collisions with stationary objects and other forklifts. Defendant has refused to sell a barrier to protect operators in foreseeable collision events in reliance on dissimilar off dock and tip over events in forklifts that did not have doors and thus were not substantially similar to forklifts with doors, and on ATD recreations of off-dock and tip-over events which it knows are not valid science, using dissimilar forklifts, which were created for litigation purposes, and which do not reflect what is likely to happen to human users. All while Defendant is aware of the perfect safety records of users of standup forklifts with doors relating to the protections and risks associated with safety doors. Despite this knowledge, Defendant has stubbornly refused to

-10-

modify its design to eliminate this risk and instead has continued to sell these forklifts that are in a defective and unreasonably dangerous condition. Its continued sale of the products, and representations to government, courts, customers, standards organizations and others that it has valid testing demonstrating that doors are dangerous and its failure to recall or warn of the dangerous propensities of the design of the subject forklift, and those of similar design and expected use, after it knew or should have known of the defects and dangers, exhibits an entire lack of care and a conscious disregard for the safety of humans who use Defendant's forklifts.

66. After the initial sale of the forklift, Defendant continued to learn of additional left leg injuries associated with its design choices, and learned (if it did not know already) that the science upon which it relied was not reliable, but did not warn users and owners of its forklift products like the subject forklift as well as forklifts of substantially similar design of the need to modify the forklifts to prevent injuries like that suffered by Plaintiff.

67. Given Defendant's knowledge of the lack of validity of its basis for refusing to include safety doors on its products, Defendant's conduct in continuing to sell standup forklifts without safety doors is intentional misconduct and driven by its profit motivated desire to avoid having hundreds of thousands of similar products to be considered unsafe and in need of retrofitting.

68. Given Defendant's knowledge of the lack of validity of its basis for refusing to include safety doors on its products, Defendant's conduct in continuing to sell standup forklifts without safety doors is grossly negligent and driven by its profit motivated desire to avoid having hundreds of thousands of similar products to be considered unsafe and in need of retrofitting

69. As a direct and proximate result of Defendant's wrongful conduct, Plaintiff is entitled to judgment against Defendant for exemplary damages to deter similar conduct in the

future and to punish Defendant for its wrongful acts, in an amount to be determined by the enlightened conscience of the finder of fact.

### COUNT THREE—LOSS OF SPOUSAL CONSORTIUM

70. Plaintiffs reallege and incorporate by reference each of the foregoing paragraphs of the Complaint as if they were fully restated verbatim herein.

71. At all times relevant to this action, Plaintiff Alexander McHale has been the spouse of Plaintiff Ashley McHale.  As the spouse of Alexander McHale, Ashley McHale had a right to the intangible benefits of Alexander's company, cooperation, conjugal fellowship, affection and aid, including the tangible benefits of general usefulness, industry, and attention within the home and family.

72. As a direct and proximate result of the Defendant's wrongful and negligent conduct, Plaintiff Alexander McHale suffered bodily injury that is permanent within a reasonable degree of medical probability and resulting pain and suffering, disability, disfigurement, mental anguish, loss of capacity for the enjoyment of life, expense of hospitalization, medical and nursing care and treatment, loss of earnings, loss of the ability to earn money, and aggravation of a previously existing condition.  As a result of these injuries to her husband, Plaintiff Ashley McHale has been deprived of her right to spousal consortium.

73. As a direct and proximate result of Defendant's design of an unreasonably dangerous standup forklift product, Plaintiff Ashley McHale has incurred the loss of companionship, services, and consortium to her husband, Plaintiff Alexander McHale, and will incur those losses in the future.

**WHEREFORE**, Plaintiffs pray that summons issue, that Defendant be served and made to appear and answer, that a JURY TRIAL be held, and that Plaintiffs be awarded judgment in Plaintiffs' favor and against Defendant, as follows:

    (a)    Under Counts One, that Plaintiff Alexander McHale be awarded damages against Defendant in an amount to be proven at trial;

    (b)    Under Count Two, that Plaintiff Alexander McHale be awarded punitive damages in an amount sufficient to punish and deter Defendant;

    (c)    Under Count Three, that Plaintiff Ashley McHale be awarded damages for her loss of spousal consortium;

    (e)    That the cost of this action be levied against Defendant; and,

    (f)    That Plaintiffs be awarded such other and further relief as this Court deems just and proper.

## JURY DEMAND

Plaintiffs demand a trial by jury on all issues related to these claims.

Respectfully submitted,

**/s/ SEAN C. DOMNICK (TRIAL COUNSEL)**
Sean C. Domnick, Esquire
Florida Bar No.: 843679
Domnick Cunningham & Whalen
2401 PGA Boulevard, Suite 140
Palm Beach Gardens, Florida 33410
Telephone: (561) 625-6260
Facsimile: (561) 625-6269
eservice@dcwlaw.com; sean@dcwlaw.com;
hsx@dcwlaw.com

(Signed by Filing Attorney with permission of Non-Filing Attorney)

**/s/ DANIEL D. MOODY**
Daniel D. Moody, J.D., B.C.S.
Florida Bar No. 0508209
575 North Broadway Avenue
Bartow, Florida 33831-0266
(863) 733-9090
(863) 534-1001 Fax
dan@moodylaw.com