UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

ALEXANDER M. MCHALE and
ASHLEY N. MCHALE,

     Plaintiffs,

v.                                    Case No: 8:19-cv-707-T-27SPF

CROWN EQUIPMENT CORPORATION,

     Defendant.

_____/

## ORDER

**BEFORE THE COURT** are Plaintiffs Alexander McHale and Ashley McHale's motions to admit expert testimony of Dr. John Meyer (Dkt. 73), Dr. John Jeka (Dkt. 74), and Dr. Jason Kerrigan (Dkt. 75), Defendant Crown Equipment Corporation's responses (Dkt. 94, 93, 95), Plaintiffs' motions to exclude expert testimony of Ronald Grisez (Dkt. 76), Dr. Elizabeth Raphael (Dkt. 77), and Dr. John Olivas (Dkt. 78), Crown's responses (Dkt. 90, 91, 92), Crown's motions to exclude expert testimony of Meyer (Dkt. 79), Kerrigan (Dkt. 80), and Jeka (Dkt. 82), Plaintiffs' responses (Dkts. 85, 86, 88), Crown's motion to exclude expert testimony of Charles Jeffress (Dkt. 83), Plaintiffs' response (Dkt. 89), and Crown's motion to exclude prior litigation plaintiffs (Dkt. 81), and Plaintiffs' response (Dkt. 87). Upon consideration, Plaintiffs' motions to admit expert testimony and Crown's motion to exclude expert testimony of Meyer are **DENIED**, and Crown's motion to exclude testimony of Jeffress is **GRANTED**. The remaining motions are **GRANTED in part** and **DENIED in part**.[1]

---

[1] Plaintiffs have also filed a "Request for Oral Argument." (Dkt. 84). Because the motions can be resolved

1

## BACKGROUND

This products liability action involves an injury Plaintiff Alexander McHale ("McHale") sustained while operating the Crown RC5500, a standup forklift designed and manufactured by Defendant Crown Equipment Corporation ("Crown"). (Dkt. 5 ¶¶ 12-17). During operation of the forklift, the operator's left foot holds the brake pedal down, and the service brake is engaged when the left foot is lifted. (Id. ¶ 19). At the rear of the forklift, there is an open entry and exit without a guard door. (Id. ¶ 18). In 2015, McHale operated the RC5500 in an Amazon distribution warehouse and lost control, colliding with the end of a storage rack. (Id. ¶¶ 12-15, 17). Prior to the collision, his left leg was moved outside the operator compartment and crushed between the forklift and the storage rack, resulting in injuries. (Id. ¶¶ 15-16). Plaintiffs allege that McHale lost his balance and that the movement was involuntary, while Crown contends that he moved his left leg intentionally. *See, e.g.*, (Id. ¶ 15); (Dkt. 105 at 10); (Dkt. 90 at 10).

Plaintiffs bring three claims against Crown: strict products liability (Count One), punitive damages (Count Two), and loss of spousal consortium (Count Three). (Dkt. 5). Essentially, they allege that the RC5500's design is defective and that "reasonable alternative safer design[s]" include a "barrier preventing the operator's leg from leaving the compartment" and "two brake pedals with the operator being trained to use the right pedal for emergency braking." (Id. ¶¶ 62-63). By these motions, the parties seek to exclude or limit the testimony of witnesses in the case.

## STANDARD

Before expert testimony can be admitted under Rule 702, Fed. R. Evid., the proffered testimony must be screened to ensure it is relevant and reliable. *Daubert v. Merrell Dow Pharm.,*

---

based on the record, the request is denied.

*Inc.*, 509 U.S. 579, 597 (1993). Expert testimony is admitted when (1) the expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches his conclusion is sufficiently reliable;[2] and (3) the testimony would assist the trier of fact, through the application of scientific, technical, or specialized expertise, in understanding the evidence or determining a fact in issue. *United States v. Frazier*, 387 F.3d 1244, 1260 (11th Cir. 2004). In determining whether the proffered testimony is reliable, the circumstances of the case are considered. *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 150-51 (1999). The party seeking to admit expert testimony must establish its admissibility by a preponderance of the evidence. *Allison v. McGhan Med. Corp.*, 184 F.3d 1300, 1306 (11th Cir. 1999).

## DISCUSSION

### *Plaintiffs' Witnesses*

I.   <u>John Meyer</u>

Plaintiffs seek to admit, and Crown seeks to exclude, expert opinions of John Meyer, Ph.D., P.E. (Dkts. 73, 79). In summary, as Crown correctly contends, Plaintiffs' motion is premature. Even if Meyer is permitted to testify as an expert, Plaintiffs must lay the proper foundation for his opinion testimony at trial. (Dkt. 94 at 2-3); *see, e.g., Holder v. Gualtieri*, No. 8:14-cv-3052-T-33TGW, ECF: 66 (M.D. Fla. Jan. 14, 2016) (denying pretrial motion to admit expert testimony, noting that "[t]his is a matter that should be addressed and resolved at trial, in conjunction with the

---

[2] A preliminary assessment must be made of "whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue." *Daubert*, 509 U.S. at 592-93. In making this assessment, courts may consider (1) whether a theory or technique can be or has been tested; (2) whether the theory or technique has been subjected to peer review and publication; (3) whether the method has a known rate of error; and (4) general acceptance in the scientific community. *Id.* at 593-95; *Rink v. Cheminova, Inc.*, 400 F.3d 1286, 1292 (11th Cir. 2005) (noting that "[t]his list of factors . . . does not exhaust the universe of considerations that may bear on . . . reliability" (citations and internal brackets omitted)).

presentation of live testimony, not via the filing of a motion").[3]

Meyer is a mechanical engineer who teaches forensic engineering and specializes in failure analysis, accident investigation and reconstruction, machine design, and photographic, optical, and visual analysis. (Dkt. 73-3 at 150-51). Meyer's challenged opinions are:

> 1. McHale's injury was a direct result of the lack of a door on the forklift he was operating and was entirely preventable.
> 2. The RC5500's design represents an unacceptable risk of lower left leg injury.
> 3. The addition of a door achieves acceptable risk.
> 4. The reprogramming of floor pedals or utilizing a system like the Hyster-Yale Operator Sensing System can further reduce residual risk.
> 5.  ANSI B56.1 does not reflect state of the art engineering practice.
> 6. Proper engineering design must recognize human factors in design, accommodating imperfect operator behavior.[4]
> 7. Relying on administrative controls when engineering controls can be utilized does not achieve acceptable risk and is a direct result of an improper application of the hazard control hierarchy.
> 8. Instructions to exit the machine in a tip-over or off-dock incident are not in the operator's best interest.
> 9. Accident data demonstrate riding out a tip-over or off-dock accident is the safest action.
> 10. Instruction for tip-over or off-dock accidents should make clear to exit only if it is obvious it can be accomplished safely.

(Dkt. 79 at 5-6).

---

[3] Crown seeks leave to reply to Plaintiffs' response to its motion to exclude based on Meyer's "newly served Affidavit," or, alternatively, to strike the affidavit. (Dkt. 100). Plaintiffs do not address the timeliness of the supplemental affidavit and have not shown that its late filing was justified or harmless. (Dkt. 85 at 4); (Dkt. 85-1). Accordingly, the motion is granted to the extent the affidavit is stricken. *See, e.g., Martin v. Omni Hotels Mgmt. Corp.*, No. 6:15-cv-1364-Orl-41KRS, 2017 WL 2928154, at *2 (M.D. Fla. Apr. 19, 2017); *Guevara v. NCL (Bahamas) Ltd.*, 920 F.3d 710, 719 (11th Cir. 2019) (noting that "a party cannot abuse Rule 26(e) to merely bolster a defective or problematic expert witness report" (quotation omitted)). Additionally, Plaintiffs seek leave to reply to Crown's responses to their motions to admit expert testimony based on Crown's purported "fail[ure] to disclose the full substance of the parties' meet and confer." (Dkt. 99 at 1-2). Because the meet and confer satisfies Local Rule 3.01(g), and in any event striking Plaintiffs' motions is unwarranted, the motion is due to be denied as moot.

[4] Crown asserts that it "has not addressed Meyer's Opinion No. 6 because Crown does not generally disagree that proper engineering design must recognize human factors in design, accommodating imperfect operator behavior. For the reasons stated herein, Crown disagrees as to any implication that Crown has not considered imperfect human behavior as part of its design." (Dkt. 79 at 24).

4

Crown contends that Meyer is not qualified to offer his opinions because he lacks experience with forklifts. (Dkt. 79 at 11-12). However, as a mechanical engineer specializing in failure analysis, accident investigation and reconstruction, and machine design, Meyer is qualified to offer these opinions. *See Hernandez v. Crown Equip. Corp.*, 92 F. Supp. 3d 1325, 1344-47 (M.D. Ga. 2015) (finding mechanical engineer qualified to testify, despite "limited experience with stand-up rider forklifts").

As to the reliability of Meyer's methodology, Crown contends that, rather than "perform[] any work to support his opinions," he is "parroting another litigation expert, Tom Berry." (Dkt. 79 at 1-2, 7, 13, 17, 23). "Inappropriate parroting occurs when an expert adopts another expert's opinion wholesale, without reaching independent conclusions in reliance on that opinion." *Fox v. Gen. Motors LLC*, No. 1:17-CV-209-MHC, 2019 WL 3483171, at *26 (N.D. Ga. Feb. 4, 2019) (citation omitted); *see also United States v. O'Keefe*, 825 F.2d 314, 319 (11th Cir. 1987) (finding no abuse of discretion in district court's exclusion of testimony that was cumulative and "nothing more than a personal vouching of one expert for another expert"). Contrary to Crown's contention, rather than "parrot" another expert, Meyer's report demonstrates that he reached independent conclusions. *See Hernandez*, 92 F. Supp. 3d at 1351 ("By taking the facts of this case, implementing . . . Berry's work, and then applying his own expert skill and knowledge, [the expert] has engaged in a reliable methodology . . . .").

In Opinions 1, 2, 3, 4, and 7, Meyer opines that McHale's injury resulted from the lack of a door, which constitutes an unacceptable risk of injury, and that the addition of a door or right brake pedal would reduce risk. (Dkt. 79 at 5-6). Crown's challenge to these opinions focuses on

the rejection of the "door theory" by some courts under *Daubert*. (Id. at 7-11); *see, e.g.*, *Dhillon v. Crown Controls Corp.*, 269 F.3d 865 (7th Cir. 2001). However, in reaching his opinions, Meyer relies on testing, data, and alternative designs that were not considered in *Dhillon*. Further, courts in this Circuit have found that "where the proposed alternative design has been produced and put to practical use in the industry, the expert does not need to personally test it to satisfy *Daubert*." *See, e.g.*, *Moncrieffe v. Clark Equip. Co.*, No. 06-22644-CIV, 2008 WL 11333222, at *8 (S.D. Fla. July 23, 2008) (collecting cases).

Here, forklifts with rear doors and with Meyer's proposed brake system have been produced and put to practical use in the industry. And Meyer has studied accident histories, as well as the RC5500's.[5] (Dkt. 73-3 at 10-21, 129-30). Additionally, he performed an accident reconstruction based on a survey of the warehouse, the path of the forklift, statements of McHale and other witnesses, and biomechanical and balance analyses from other experts. (Id. at 27-37). He also reviewed relevant safety standards and performed a risk analysis of the current and alternative designs. (Id. at 37-106). This sufficiently establishes the reliability of his methodology in formulating his opinions.[6] Moreover, Meyer's opinions would assist the jury, since causation

---

[5] As to the brake system, Crown reasons that because Meyer testified that, absent a rear door, the forklift's design would be defective even if his proposed brake system was implemented, and if there was a door, the design would not be defective without the proposed brake system, his opinion would "provide no assistance to a juror seeking to determine whether the Crown RC5500 was defective as it would be solely dependent on the existence of a door." (Dkt. 79 at 18-19). However, Crown cites no authority in support of the proposition that if an alternative design is insufficient to remedy a design defect, the alternative design is irrelevant in a products liability case.

[6] Opinion 7 concerns measures to reduce risk in the context of the "hazard control hierarchy," which Crown does not address in its motion. (Dkt. 73-3 at 62-80); *see also Perau v. Barnett Outdoors, LLC*, No. 8:17-cv-550-T-JSS, 2019 WL 2145513, at *4 (M.D. Fla. Apr. 24, 2019) (collecting cases and allowing similar testimony). As to Opinion 1, Crown contends that because Meyer's reconstruction of the path of the forklift is not accurate, the methodology supporting the opinion is unreliable. (Dkt. 79 at 19-21). However, Crown does not explain how the inaccuracy of the path of the forklift affects Meyer's opinion as to causation. And in any event, an erroneous factual

and the availability of alternative designs are relevant to Plaintiffs' claims. *See Aubin v. Union Carbide Corp.*, 177 So. 3d 489, 512-14 (Fla. 2015).

In summary, Meyer's opinions satisfy *Daubert*. Crown is free to challenge any shortcomings in the opinions during cross-examination. *See Daubert*, 509 U.S. at 596 ("Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence."); *Quiet Tech. DC-8, Inc. v. Hurel-Dubois UK Ltd.*, 326 F.3d 1333, 1345 (11th Cir. 2003) (noting that "in most cases, objections to the inadequacies of a study are more appropriately considered an objection going to the weight of the evidence rather than its admissibility" (quotation omitted)).

In Opinion 5, Meyer opines that ANSI B56.1 "does not reflect state of the art engineering practice."[7] (Dkt. 79 at 6). Crown moves to exclude this opinion, contending that "Meyer is not a member of the ANSI B56.1 committee[,] . . . has never attended an ANSI B56.1 meeting[,] . . . [and] does not know what the ANSI B56.1 committee has and has not considered in promulgating their standards." (Id. at 24). However, Crown cites no authority supporting its proposition that an expert must be a member of the committee governing standards in order to offer an opinion on the state of the art. And Meyer has reviewed the relevant standards and their history. *See* (Dkt. 73-3 at 3-4); *Krik v. Crane Co.*, 71 F. Supp. 3d 784, 787 (N.D. Ill. 2014) (allowing testimony from an

---

assertion goes to the weight of his testimony, not its admissibility.

[7] As Meyer explains, ANSI B56.1 standards are the "principal U.S. voluntary industry standards relating to stand-up forklifts." (Dkt. 73-3 at 43). Among other things, ANSI B56.1 provides that stand-up forklifts "shall be designed with open operator compartments to permit easy ingress and egress. This allows the operator, where possible, a free and easy egress from the truck in the event of an imminent tipover or off-the-dock accident." (Id. at 45).

7

expert who has "substantial experience in researching the state of the art . . . at least from a historical perspective"). It follows that his opinion will not be excluded.

Opinions 8, 9, and 10 relate to the appropriate protocol in the event of a forklift tip-over or off-the-dock incident, specifically that the operator should remain inside the compartment unless it is "obvious" an exit "can be accomplished safely." (Dkt. 79 at 6). To formulate these opinions, Meyer compared the likelihood of tip-over and off-the-dock incidents against the risk of collisions, evaluated peer-reviewed literature, and noted shortcomings in ATD studies, referenced by Crown's experts. (Dkt. 73-3 at 100-02, 107, 117-19); *e.g.*, (Dkt. 90-5 at 12-14). Although Meyer has not performed testing to support his opinions, courts have allowed similar opinions without reliable testing. *Hernandez*, 92 F. Supp. 3d at 1345-47 (allowing opinion that "during tip-over or off-dock accidents, forklift operators would be safer staying inside the operator's compartment than in exiting the forklift," despite excluding reference to flawed simulations); (Dkt. 79-2 at 8-9). And although Crown challenges Meyer's reliance on a statistical analysis of accident data generated by Berry, Meyer reviewed all of the accident reports. (Dkt. 79-2 at 4, 6). Any shortcomings in his analysis, including as to his review of the accident reports or lack of testing, goes to the weight of his testimony, and may be addressed during cross-examination. Finally, Meyer's opinions will assist the jury, since Crown contends that the addition of a door on the RC5500 would impede an operator's egress from the operator compartment during a tip-over or off-the-dock incident. (Dkt. 85 at 18).

II.     John Jeka

Plaintiffs seek to admit, and Crown seeks to exclude, the expert opinions of John Jeka,

8

Ph.D. (Dkts. 74, 82). Plaintiffs' motion is premature since even if Jeka is permitted to testify, Plaintiffs must lay the proper foundation for his expert opinions at trial.[8]

As a professor of kinesiology with a Ph.D. in neuroscience, Jeka is recognized for his work on human locomotion and balance, and intends to offer these opinions:

> 1. The operation and use of stand-up forklifts present challenges to the operator's balance.
> 2. The operator's response to balance disturbances associated with stand-up forklift operation foreseeably includes movement of the operator's left foot to the operator's left.
> 3. The operator's movement of his left foot as an aid to balance is not voluntary.
> 4. The plaintiff operator's left foot, more likely than not, to a reasonable degree of scientific certainty, moved leftwards as part of an automatic balance retention process, immediately prior to the event, indicating a loss of balance that led to the Injuries suffered by the Plaintiff.

(Dkt. 74 at 11-14). Crown contends that these opinions should be excluded because Jeka "has not performed any work to correlate potential challenges to the balance system of human beings to the specific operation and design configuration of a stand-up rider lift truck." (Dkt. 82 at 2-3). Crown acknowledges that Jeka "has experience in the field of kinesiology" and "has evaluated potential balance challenges to human beings," but contends his background and experience are irrelevant to the "specific issues in this case." (Id. at 5). Notwithstanding, Jeka is qualified to offer these opinions, and his methodology is sufficiently reliable.

Although Jeka does not specialize in matters relating to the operation of a forklift, his work focuses on human locomotion and balance. *See Wheeler v. John Deere Co.*, 935 F.2d 1090, 1100

---

[8] Crown moved for leave to reply to Plaintiffs' response based on Jeka's "newly served Affidavit," or, in the alternative, to strike the affidavit. (Dkt. 101). Plaintiffs do not address the timeliness of the supplemental affidavit and have not shown that its late filing was justified or harmless. (Dkt. 88 at 5); (Dkt. 88-2). Accordingly, the motion is granted to the extent the affidavit is stricken.

(10th Cir. 1991) ("In a products liability action, an expert witness is not strictly confined to his area of practice, but may testify concerning related applications; a lack of specialization does not affect the admissibility of the opinion, but only its weight."); *see also Hernandez*, 92 F. Supp. 3d at 1350. And Jeka's report demonstrates that he understands the RC5500's design and its operation, has operated Crown forklifts, and has sufficient knowledge to apply his balance expertise to the operation of the forklift. *See, e.g.*, (Dkt. 74-4 at 1, 3, 5-7).

Jeka also describes his methodology used to formulate his opinions, including consideration of the RC5500 design and the science of human movement and balance, study of peer-reviewed literature and deposition testimony relating to forklift operation and balance, including McHale's statements, and an examination of the warehouse where the incident occurred. (Id. at 8-27, 41-45). And he details events that support his opinions. (Id. at 20-22). Although Crown challenges his opinions on the basis that he did not perform any testing, Crown cites no authority in support of the proposition that testing is required. (Dkt. 82 at 3); *see, e.g.*, *Bitler v. A.O. Smith*, 400 F.3d 1227, 1232-36 (10th Cir. 2004) (noting that testing is not required to admit expert opinions based on an existing body of science). Finally, Jeka's opinions would assist the jury, since matters such as causation are relevant to Plaintiffs' claims.

Crown contends that three additional opinions "derived from his four main opinions . . . should be excluded for the reasons previously discussed." (Dkt. 82 at 14). First, Crown challenges Jeka's opinion that balance issues may occur due to "sensory overload" in busy work environments, contending there is no evidence that McHale suffered sensory overload. (Id.); (Dkt. 74-4 at 8); (Dkt. 88-3 at 94). Based on his experience, training and education, Jeka is qualified to

opine that balance issues may occur due to sensory overload. Whether sensory overload caused or contributed to McHale's loss of balance is fact dependent and for the jury to determine, assuming there is factual support for that. And in any event, before an expert may opine on that, there must be evidence that McHale suffered sensory overload and a reliable methodology relating sensory overload to his loss of balance. Second, Crown challenges Jeka's assumption that scratch marks on the inside of the forklift indicate operator balance issues, despite acknowledging that he has no evidence of the cause of the scratches. (Dkt. 82 at 14); (Dkt. 73-4 at 28); (Dkt. 88-3 at 76-78). Absent evidence of the cause of the scratches, testimony relating to the scratches as a basis to support Jeka's opinions is inadmissible. Last, Crown challenges Jeka's characterization of the accident as "unexpected." (Dkt. 82 at 14); (Dkt. 88-3 at 65, 128). To the extent this characterization constitutes an expert opinion, Crown's request to exclude the opinion under *Daubert* is denied.

III.     Jason Kerrigan

Plaintiffs seek to admit, and Crown seeks to partially exclude, the testimony of Jason Kerrigan, Ph.D. (Dkts. 75, 80). Plaintiffs' motion is premature since even if Kerrigan is permitted to testify, Plaintiffs must lay the proper foundation for his expert opinions at trial.

As a professor of mechanical and aerospace engineering with a background in biomechanics, Kerrigan intends to offer opinions relating to tests performed using anthropomorphic test devices (ATDs), a biomechanical analysis of the incident, and "how the design of the forklift allowed Mr. McHale to be injured."[9] (Dkt. 75 at 11-13). Crown seeks to

---

[9] Although Kerrigan also opined on instructions to operators in tip-over and off-dock events, Crown asserts that, as part of the meet and confer between counsel, Plaintiffs agreed that Kerrigan will not be offering the opinion. (Dkt. 80 at 2). Accordingly, Crown is not seeking to exclude this opinion.

exclude only the "design" opinions, contending that Kerrigan is not qualified, his testimony on alternative designs of the RC5500 is not based on sufficient facts or data, and his opinions are cumulative to Meyer's. *See* (Dkt. 80). In summary, Kerrigan's opinions on the biomechanical forces relating to the addition of a door on the RC5500 will be permitted. However, he may not offer strictly design opinions, including a comparison of the current and alternative designs, whether the addition of a door constitutes a reasonable alternative design, or whether Crown forklifts should be manufactured with doors.

Crown has not established that Kerrigan has experience with forklift design or the same level of mechanical design experience as Meyer. (Dkt. 80 at 5-6); *Hernandez*, 92 F. Supp. 3d at 1350-52 (finding expert with no training, education, or experience in designing forklifts or similar products unqualified to offer design defect opinions). And even if qualified, he has not adequately explained his methodology supporting his alternative design opinions. Notwithstanding, as Plaintiffs correctly contend, based on his background, experience, and training, and the breadth of the material he reviewed to formulate his opinions, he may opine "from a biomechanical point of view, that changes in the design of the forklift, that other experts describe . . . would have prevented, or reduced the likelihood of, Mr. McHale's injuries." (Dkt. 75 at 12). This opinion

---

Crown further asserts that, in their motion to admit Kerrigan's testimony, Plaintiffs "attempt[] to add opinions that Kerrigan did not disclose in his expert report, including (1) after Mr. McHale's left foot moved to his left, . . . his balance system then moved the foot downward to broaden his base of support; (2) because there was no floor there, or only the edge of the compartment floor, he was caused to lose his balance; and (3) this was not a result of an intentional act by Mr. McHale but was, instead, the product of responses to challenges to his balance." (Dkt. 95 at 4 (internal quotation marks omitted)). To the extent these opinions were not included in Kerrigan's report, he will not be permitted to testify to them.

Additionally, Crown moved for leave to reply to Plaintiffs' response based on Kerrigan's "newly served Affidavit," or, in the alternative, to strike the affidavit. (Dkt. 102). Plaintiffs do not address the timeliness of the supplemental affidavit and have not shown that its late filing was justified or harmless. (Dkt. 86 at 2 n.2); (Dkt. 86-2). Accordingly, the motion is granted to the extent the affidavit is stricken.

would assist the jury since the availability of reasonable alternative designs is relevant to Plaintiffs' claims. Indeed, Crown's expert, Raphael, also intends to offer opinions on the biomechanical forces during operation of the RC5500, with and without a door. *See* (Dkt. 91). In summary, although he may not offer design opinions, Kerrigan will be permitted to testify on the biomechanical forces relating to the addition of a door on the RC5500.

IV.    Charles Jeffress

Rule 26(a)(2)(C), Fed. R. Civ. P, requires disclosure of "(i) the subject matter on which the witness is expected to present evidence . . . and (ii) a summary of the facts and opinions to which the witness is expected to testify." In their disclosure of Charles Jeffress, former director of the Occupational Safety and Health Administration ("OSHA"), Plaintiffs refer to a 205-page deposition transcript from a separate case. (Dkt. 83-1). This fails to satisfy Rule 26(a)(2)(C), and the failure to provide the required information may warrant exclusion of the expert's testimony at trial. *See Bingham v. Baycare Health Sys.*, No. 8:14-cv-73-T-23JSS, 2016 WL 5106946, at *2 (M.D. Fla. Sep. 20, 2016). In any event, absent qualifications or a reliable methodology, Jeffress' opinions do not satisfy *Daubert* and are excluded.[10]

***Crown's Witnesses***

I.    Ronald Grisez

Ronald Grisez, P.E., is a mechanical engineer and Crown's director of product safety. (Dkt.

---

[10] Plaintiffs intend to present Jeffress' testimony that when OSHA promulgated certain rules, it did not address how the operator of a side-stance forklift should react to a tip-over or off-dock event. (Dkt. 89 at 2). Crown observes that Jeffress was not designated as an expert in the case in which he was deposed. (Dkt. 83 at 4). To the extent Plaintiffs intend for Jeffress to testify as a lay witness, Crown asserts that it "will address any issues related to his specific lay witness testimony at that time." (Id. at 5).

13

90-6 at 1). He is responsible for the "safety evaluation of [Crown's] lift truck products," and has testified as an expert in several cases. (Id. at 1-2); (Dkt. 90 at 2); (Dkt. 90-1 at 1-3). Plaintiffs move to exclude two of his opinions:

> 1. Crown's instructions and warnings supplied with the forklift are appropriate and, if heeded, would have prevented the accident and injury. No further warning or instruction would have prevented McHale's accident.

> 2. There were no forces acting on McHale at the time of the accident that would cause him to lose his balance or his left leg to come outside of the operator compartment. His left leg was outside of the operator compartment because he intentionally placed it there prior to striking the pole.

(Dkt. 76 at 1-2).

As to the first opinion, Grisez may testify as to the general nature and adequacy of the RC5500's warnings and related training, but not matters relating to causation. Grisez has been involved in the design of Crown forklifts, including their warnings, training, and compliance with applicable standards. *See, e.g.*, (Dkt. 90-5 at 1). He has reviewed Crown's accident reports, design files, and testing, and attended a site inspection of the warehouse. (Dkt. 90 at 11, 16). Further, he has been involved with various organizations, including the Industrial Trucking Association's General Engineering Committee and the ANSI/ITSDF B56.1 "Safety Standard for Low Lift and High Lift Trucks" Subcommittee. (Dkt. 90-5 at 1).

However, as to the reliability of Grisez' methodology, although he notes the RC5500's warnings, he does not sufficiently explain the basis for his opinion that, had McHale heeded the warnings and followed his training, the accident would not have occurred, or that additional warnings would not have prevented the accident. (Id. at 5-9, 15). For example, Crown has not shown that Grisez compared the RC5500's warnings to relevant standards, tested the warnings and

14

training, or compared them to similar warnings and training offered by manufacturers of similar products. *See Lockman v. S.R. Smith, LCC*, 405 F. App'x 471, 473 (11th Cir. 2010) (finding no abuse of discretion in excluding sufficiency of warning opinion where expert had not researched or performed studies on warning labels and their effects in circumstances similar to plaintiff's); *see also McLane v. Ethicon Endo-Surgery, Inc.*, No. 3:12-cv-406-J-39PDB, 2014 WL 12621192, at *2 (M.D. Fla. Apr. 4, 2014) (noting that "expertise in engineering does not make [an expert] fit to offer opinions relating to the adequacy of warnings"). Indeed, Grisez acknowledged that Crown has not interviewed operators who have suffered left foot injuries to determine the cause. *See* (Dkt. 76-2 at 17-18); *Hernandez*, 92 F. Supp. 3d at 1351 (excluding opinion for lack of testing where "[t]here is no evidence that [the expert] did something as simple as interviewing or surveying forklift operators on these points"). And although he observes that following the 1999 OSHA Final Rule on Powered Industrial Truck training, the incident rate of serious lower left leg injuries decreased, he does not adequately explain causation or connect these statistics to McHale's accident. (Dkt. 90-9 at 10); (Dkt. 90-5 at 10).

As to the second opinion, Grisez is permitted to testify that the forces acting on McHale during the incident would not have caused him to lose his balance or his leg to exit the operator compartment, but not that McHale placed his leg outside the compartment intentionally. Although Grisez does not have expertise in human balance, he is a mechanical engineer with extensive experience with forklifts and the design of the RC5500, including its "five points of contact."[11]

---

[11] As Grisez explains, the RC5500's "five points of contact" are (1) an operator's right hand on the multi-function handle; (2) the left hand on the steering tiller; (3) the right foot on the presence pedal; (4) the left foot on the brake pedal; and (5) the back on the backrest. (Dkt. 76-2 at 73, 79).

He has reviewed material to formulate his opinion, including design files and testing, accident reports, customer correspondence relating to forklifts, and field studies. (Dkt. 76-2 at 50-51); (Dkt. 90-5 at 10-13); *Hernandez*, 92 F. Supp. 3d at 1340 (allowing similar opinion based on expert's "training and experience as a mechanical engineer, combined with his testing of forklifts"). However, apart from his observation that the forces were insufficient to "push [McHale's] foot outside," he does not explain the methodology supporting his opinion that McHale's foot "was put out there volitionally." (Dkt. 90-9 at 5-6). Rather, he acknowledges that McHale is "the best one to answer" "how his foot came out." (Id. at 5). Accordingly, that opinion is excluded.

II.     Elizabeth Raphael

Dr. Elizabeth Raphael is a physician with a degree in mechanical engineering who analyzes the biomechanical forces and effects related to collisions and other mechanisms of injury. (Dkt. 91-1 at 1-2). She has offered expert testimony on biomechanics in several cases, including a design defect case which involved a left leg injury on a Crown forklift and a case involving the RC5500. (Dkt. 91 at 2); (Dkt. 91-7 at 2). Further, she has specialized competence in vehicular injury analysis, accident reconstruction, occupant kinematics, and computer analysis of human motion. (Dkt. 91-1 at 1). Plaintiffs move to exclude her opinions that

> 3. The forces on McHale prior to impact would not have resulted in his lower extremity being outside the running lines of the truck.
> 4. McHale's left lower extremity was outside the operator compartment because he moved it there volitionally prior to impact.
> 5. A solid steel entry door would not necessarily have prevented McHale's injury and could have resulted in more severe injuries.
> 6. A solid steel entry door will result in more severe injuries to forklift operators in tip over or off-the-dock accidents.

16

7. Had McHale been operating the forklift using the appropriate five-point stance and maintained his left foot inside the running lines of the forklift at all times, he would not have been injured.

(Dkt. 77 at 1-2). Based on her reports, Plaintiffs conclude that Raphael also intends to offer the following opinions, which they seek to exclude:

A. Crown's warnings and its training are appropriate and effective.
B. That McHale intentionally put his foot into harm's way and could not have lost his balance while using the forklift.
C. In a tip-over or an off-the-dock accident, the safest course of action would be to exit the forklift before it impacted the ground.

Opinions 3 and 4, which relate to the forces on McHale prior to impact and the purportedly volitional movement of his left leg, are not excluded. Based on Raphael's education, experience, and training, as well as her review of case-specific documents and surrogate study of an RC5535, she is qualified to offer opinions on the biomechanical forces during operation of the forklift. (Dkt. 91-3 at 1-8). Indeed, courts have found her qualified to offer her opinions on "the mechanical aspects of the forces" of accidents and "medical causation" of injuries. *See Thompson v. Polaris Indus. Inc.*, No. CV-16-02868-PHX-DJH, 2019 WL 2100005, at *8 (D. Ariz. May 14, 2019).

Crown has demonstrated the reliability of Raphael's methodology. For example, she obtained certification training on and operated an RC5535. (Dkt. 91-3 at 11). And during the surrogate study, an individual operated and stopped a RC5535-35 by "plugging" (adjusting the multi-task handle through neutral to the opposite direction of travel) and using the brake pedal at speeds of 3.6, 5.0, and 7.2 miles per hour. (Dkt. 91-3 at 11); (Dkt. 91-4 at 14); (Dkt. 91 at 9). Raphael observed the forces on the operator and that the individual did not "lose his balance or take a compensatory step." (Dkt. 91-4 at 14). While she acknowledges that the study did not "re-

creat[e]" McHale's incident, it demonstrates scientific principles related to forklift operation, balance, and the forces during deceleration. (Dkt. 91-6 at 2); *see Heath v. Suzuki Motor Corp.*, 126 F.3d 1391, 1396 (11th Cir. 1997) (finding no abuse of discretion in admission of evidence involving rollovers of three dissimilar vehicles to explain "how rollovers occur"); *Hernandez*, 92 F. Supp. 3d at 1340 (allowing opinion that forces "acting on the operator during braking or turning are not sufficient in magnitude or concentrated at a location that would cause an operator's leg to leave the operator's compartment"). Any challenges to her methodology go to the weight of her opinions, not their admissibility, and can be explored during cross-examination.

As to Opinion 4, unlike Grisez, Raphael explains in detail the basis for her opinion that McHale intentionally moved his leg outside the operator compartment, based on scientific principles, including muscular and reflex movements. (Dkt. 91-3 at 8-10). Moreover, as a physician with specialized knowledge of occupant kinematics, she is qualified to offer the opinion. And although Plaintiffs assert that the opinion should be excluded because Raphael is not a "mind reader," the opinion is based on her analysis of the RC5500 and the incident. *See, e.g.*, *Hernandez*, 92 F. Supp. 3d at 1339-40 (finding opinion that movement was "volitional act" not "speculation," but "derived from evidence"). Finally, the opinion would assist the jury in understanding the forces in play during McHale's operation of the forklift.

As to Opinions 5 and 6, which relate to the addition of a door on the RC5500, Raphael's opinions on the biomechanical forces relating to the addition of a door will be permitted. However, she may not offer design opinions, including a comparison of the current and alternative designs, whether the addition of a door constitutes a reasonable alternative design, or whether Crown

forklifts should be manufactured with doors. Like Kerrigan, Raphael has no experience with forklift design, or with mechanical design in general. And even if qualified, she has not adequately explained a methodology to support an alternative design opinion. However, based on her background, experience, and training, and the material she reviewed to formulate her opinions, she may opine from a biomechanical perspective regarding the addition of a door on the forklift. (Dkt. 91-3 at 10-11). As for her opinion relating to tip-over and off-the-dock accidents, the methodology to support the opinion is reliable. Raphael has reviewed substantial material, including tests which have been deemed scientifically reliable by courts, including testing which utilized ATDs to evaluate the forces and injury potential during a tip-over or off-dock event. *See e.g., Hernandez*, 92 F. Supp. 3d at 1340. Finally, these opinions would assist the jury.

As to Opinion 7 on causation, Raphael is qualified to offer her opinions on the biomechanical forces during operation of the RC5500. To formulate this opinion, she explains the "five-point stance" and occupant kinematics as they relate to McHale's collision and his testimony. (Dkt. 91-3 at 8-10). The opinion would also assist the jury, especially in light of Jeka's opinion that McHale lost his balance and moved his foot because of an automatic balance retention process. (Dkt. 91-4 at 13).

As to warnings and training, Plaintiffs do not identify which opinions they seek to exclude. Accordingly, their challenge is denied without prejudice.

Plaintiffs also seek to exclude Raphael's opinions relating to McHale "intentionally" moving his left foot outside the compartment and his inability to lose balance. (Dkt. 77 at 2). However, this opinion duplicates Opinions 3 and 4, and is not excluded for the reasons noted.

19

Last, Plaintiffs seek to exclude her opinion that in a tip-over or off-the-dock incident, the operator should exit the forklift. (Id.). As Crown observes, Plaintiffs do not specify which opinion they seek to exclude. (Dkt. 91 at 17). In any event, as noted as to Opinion 6, although Raphael may not offer design opinions, her opinions on biomechanical forces relating to the addition of a door on the RC5500, including as they relate to tip-over and off-the-dock accidents, are not excluded.

III.    John Olivas

John Olivas, Ph.D., P.E., is a mechanical engineer and materials specialist who consults "with large organizations, on initiatives to identify and mitigate risk within the organizations as it relates to potential incidents involving engineering products or operational processes." (Dkt. 92-3 at 2); (Dkt. 92-1 at 1). He performed an accident reconstruction of McHale's incident. *See* (Dkt. 92-3). Plaintiffs seek to exclude several of his opinions (Dkt. 78 at 1-2):

> 1a. The subject Crown RC5525-30 lift truck was compliant with ANSI B56.1.
> 1b. Both the design of the lift truck and training provided to a certified operator are appropriate and sufficient to mitigate the risk of a crush injury to the foot.
> 1c. The addition of a door or some method to physically prevent the operator from extending their foot would significantly affect the risk to the operator in a tip over or off dock scenario.

Plaintiffs address these opinions together, contending that they constitute "design opinions," and that Olivas is not qualified to offer design opinions. (Dkt. 78 at 14-16). Notably, Olivas acknowledged during his deposition that he would not offer opinions "regarding the design of the truck," and that he would "defer to Ron Grisez or someone at Crown." (Dkt. 78-8 at 182). Crown contends that these opinions do not constitute "design opinions." (Dkt. 92 at 9). Even if Crown is correct, Crown has not established that the opinions satisfy *Daubert*. First, Olivas has no stated expertise with forklift design or ANSI B56.1, and even if qualified, he does not provide a

20

reliable methodology to support his opinion that the forklift is compliant with ANSI B56.1. In fact, apart from his conclusion that the forklift is compliant and his acknowledgement of the standard, ANSI B56.1 is not addressed in his preliminary report. *See* (Dkt. 92-3 at 16-18).[12]

Further, although Olivas asserts that he is "familiar with the results of evaluations performed in the late 1980s and early 1990s on the subject of doors added to an operator compartment," and that he has "participated and witnessed testing done in 2018 and 2019 where a door was installed on a stand-up rider lift truck," he does not adequately explain the methodology used to reach his opinions that the design of the forklift and training are "appropriate and sufficient to mitigate the risk of a crush injury to the foot," and that the "addition of a door or some method to physically prevent the operator from extending their foot would significantly affect the risk to the operator in a tip over or off dock scenario." (Dkt. 92-3 at 17-18). Unlike other experts, he makes no reference to accident histories or reports, a comparison of forklifts in the industry, design standards, risk assessment, or the scientific principles underlying the testing.

As to Olivas' opinion on training, he asserts that the forklift's operator manual "instructed on the proper use of the Service Brake" and "provided repeated warnings of the hazard associated with placing the foot outside of the operator compartment," and that a video "explicitly state[d] the crush hazard potential associated with having the foot outside the operator compartment." (Dkt. 92-3 at 11). However, he conducted no independent analysis or testing, and Crown has not

---

[12] Crown asserts that Opinion 1a is "not Olivas' primary area of testimony. This was simply included in his report as an observation related to his accident reconstruction. The bases for this opinion will be provided by Crown's expert Ron Grisez which Dr. Olivas is relying upon." (Dkt. 92 at 9-10). Accordingly, to the extent Olivas relies on another expert's opinion without performing independent verification or reaching his own conclusions, or merely "vouch[es]" for another expert, the opinion will be excluded. *See O'Keefe*, 825 F.2d at 319.

demonstrated the reliability of his methodology. Further, these opinions are cumulative to other experts' opinions. Nor would they assist the jury.

Plaintiffs next challenge Olivas' opinions relating to surveillance footage of the incident:

2a. The video graphic evidence does not support that McHale lost his balance prior to the POR.[13]
2b. Video assessment does not support McHale departing the operator compartment prior to the lift truck POR.
2c. Video assessment indicates operator movement after the lift truck is at the POR.
2d. McHale was subjected to an average deceleration of 0.187 or less, which is within the performance specifications of the subject lift truck.

Plaintiffs address these opinions together, contending that they should be excluded because Olivas "does not have special video viewing skills," the footage is not clear, he has no expertise in viewing "pixelated images," and he did not describe his methodology. (Dkt. 78 at 17-18). Crown responds that Olivas' frame-by-frame analysis of the footage, which includes the location, orientation, and speed of the RC5500 prior to impact, will assist the jury in understanding the otherwise "difficult to understand" footage, and that he used the footage to perform his accident reconstruction. (Dkt. 92 at 11-14).

Although courts have held that an expert opinion should be excluded when the expert is no better suited than the jury to interpret a video's content, *see, e.g.*, *Sherrod v. McHugh*, 334 F. Supp. 3d 219, 271-72 (D.D.C. 2018) (collecting cases), some of Olivas' analysis may assist the jury in understanding the surveillance footage. His frame-by-frame analysis provides information on the location, orientation, and speed of the RC5500, all relevant to the forces in play during the incident,

---

[13] "POR" refers to the point of rest of the forklift, which is the "moment which the lift truck stops directional movement." (Dkt. 92-3 at 3).

all of which may be outside the experience of the jury. (Dkt. 92-3 at 3-6). Although Plaintiffs challenge Olivas' conclusions that McHale "completed a clockwise turn of between 180° and 270°" that took between 7 and 8 seconds on the basis that "[t]his is nowhere near the precision that an expert must deliver for his opinions to be admissible," Plaintiffs provide no authority in support of their contention. (Dkt. 78 at 18). And as Crown observes, Olivas reviewed the surveillance footage with specialized software in performing his accident reconstruction. (Dkt. 92 at 14); (Dkt. 78-8 at 202-13). In any event, that goes to the weight of his testimony, not its admissibility.

Notwithstanding, Crown has not satisfied *Daubert* as to Olivas' opinions that the video does not "support that Mr. McHale lost his balance," "depart[ed] the operator compartment prior to the lift truck POR," or moved after the impact. (Dkt. 78 at 2). Apart from these conclusions, Olivas does not address balance issues in his report.[14] Simply put, Crown has not established that Olivas is better suited than the jury to determine whether the video shows that McHale lost balance,

---

[14] Rather, when asked what would be necessary to see in the footage to determine if McHale lost his balance, Olivas responded:

> A: Well, something definitive of the motion of Mr. McHale relative to the -- the lift truck. It just doesn't have the resolution to be able to determine that, so you can't make that conclusion based on the videographic evidence.
> . . .
> Q: Explain to me what the body motion would look like if it got there secondary to loss of balance. What would you be looking for - hands flailing in the air or what; how would he move differently than if he intended to move it there?
> A: So with regards to the -- the dynamics of Mr. McHale, I would refer to Dr. Raphael to comment on that. My work and the conclusion I make here in the reconstruction is just based on the videographic evidence. There's not any indication here that Mr. McHale is moving relative to the lift truck until after the lift truck and Mr. McHale are at the point of reference.

(Dkt. 78-8 at 192-93).

departed the operator compartment before impact, or moved after impact. Accordingly, Olivas is not permitted to testify on these issues as they relate to the video.

Plaintiffs also challenge Olivas' opinions relating to whether McHale voluntarily moved his left foot outside the forklift's operator compartment:

> 3. The action of removing McHale's left foot from the brake and the subsequent slowing of the lift truck, is not sufficient to result in his foot involuntarily leaving the operator compartment.
> 4a. McHale intentionally extended his foot outside the operator compartment, in violation of the training and manufacturer's warnings to stay within the operator compartment.
> 4b. The cause of the injury to McHale was due to McHale voluntarily extending his left foot outside the operator compartment prior to the lift truck making contact with the rack protector, in direct violation to his training and Crown's warnings.

Crown has not shown that these opinions satisfy *Daubert*. Even if Olivas is qualified as a mechanical engineer to testify as to the forces a forklift operator experiences during operation, Crown has not shown that he is qualified to opine on causation. Further, he does not explain his methodology in determining that the action of McHale removing his left foot from the brake and the deceleration of the forklift is insufficient to cause the foot to leave the operator compartment. Rather, although Olivas concluded that the speed of the forklift prior to impact was less than 5 miles per hour and the deceleration forces were between .164 and .187 g, he does not adequately explain how this data supports his opinion that the forces were insufficient. (Dkt. 78-9 at 6, 16-17); (Dkt. 78-8 at 196-97). For example, he does not consider the same breadth of material as Grisez, and, unlike Raphael, does not address balance issues related to operation of the RC5500. And during his deposition, he "deferred" to Raphael on biomechanical questions. (Dkt. 78-8 at

171). Accordingly, to the extent he relies on another expert's opinion without independent verification or reaching his own conclusions, the opinion will be excluded.

Further, as Crown acknowledges, Olivas' opinions that McHale "intentionally" and "voluntarily" placed his foot outside the operator compartment and that his injury was caused by this action is based on his opinion that the forces were insufficient to cause McHale's foot to exit the compartment. (Dkt. 92 at 15); (Dkt. 78-9 at 17). As noted, Crown has not demonstrated that these opinions are supported by a reliable methodology. And unlike Raphael's opinions, Olivas does not address other possible involuntary causes, such as reflex movements. Rather, as he acknowledged, "with regard to Mr. McHale's intention, I would defer to Mr. McHale. With regard to the body movement, I would defer to Dr. Raphael." (Dkt. 78-8 at 230). In summary, absent a reliable methodology to support the opinions, they are excluded.[15]

### Prior Litigation Plaintiffs

Plaintiffs designated plaintiffs from prior litigation as experts in this case. (Dkts. 81-1, 81-2, 81-3). Jose Hernandez and Dustin Reinard suffered leg injuries while operating a Crown forklift "substantially similar" to the RC5500, and Nathan Petersen suffered injuries while operating a forklift manufactured by Raymond. (Dkt. 87 at 2-3). These witnesses intend to testify on "the operation and potential for loss of balance and left leg/foot injuries," "actual left leg/foot crush injuries suffered when using a standup side stance . . . forklift," and "living with a below the knee prosthetic." (Dkts. 81-1 at 1, 81-2 at 1, 81-3 at 1). Crown moves to exclude their testimony,

---

[15] Plaintiffs also challenge Olivas' opinion that McHale's purportedly intentional action was in violation of his training and the RC5500's warnings. (Dkt. 78 at 22-23). Because these opinions are due to be excluded for the reasons discussed, it is unnecessary to address this challenge.

contending that the testimony does not satisfy *Daubert* and "any fact testimony they could provide would be irrelevant, unfairly prejudicial, confusing the issues and misleading to the jury." (Dkt. 81 at 2). Upon consideration, while the witnesses may not testify as experts, Crown's motion to exclude their testimony as lay witnesses is premature and denied without prejudice.

As Crown observes, Hernandez, Reinard, and Petersen lack the qualifications necessary to formulate any expert opinions. (Dkt. 81 at 4-5). Plaintiffs provide no authority in support of the proposition that their involvement in forklift accidents renders them qualified. (Dkt. 97 at 9). And Hernandez, Reinard, and Petersen have not pointed to any reliable methodology to support their purported expert opinions. Rather, as Plaintiffs acknowledge, "[f]or the most part, . . . they are indeed probably fact witnesses who have personal knowledge of the events they were involved in." (Dkt. 87 at 10). In short, the witnesses are unable to offer expert opinions at trial.

As to non-expert testimony, Crown contends that "any fact testimony they could provide would be irrelevant, unfairly prejudicial, confusing the issues and misleading to the jury." (Dkt. 81 at 2). However, the Eleventh Circuit has explained:

> prior similar incidents illustrating a potential design defect are admissible if (1) the proponent makes a showing that the prior accidents are substantially similar, (2) the prior accidents are not too remote in time, and (3) the probative value of the evidence outweighs any potential prejudice or confusion. We have held that evidence of similar accidents might be relevant to the defendant's notice, magnitude of the danger involved, the defendant's ability to correct a known defect, the lack of safety for intended uses, the strength of a product, the standard of care, and causation.

*Crawford v. ITW Food Equip. Grp., LLC*, 977 F.3d 1331, 1350 (11th Cir. 2020) (citations and quotation marks omitted).

As Plaintiffs correctly contend, evidence of prior incidents involving Crown forklifts substantially similar to the RC5500 may be relevant to whether the design is defective, Crown's notice of any defect, and causation. (Dkt. 87 at 2-3). Courts in this Circuit have admitted evidence of prior similar incidents which were not too remote in time and involved the same product. *See, e.g.*, *Hessen for Use and Benefit of Allstate Ins. Co. v. Jaguar Cars, Inc.*, 915 F.2d 641, 650 (11th Cir. 1990) (finding no abuse of discretion where court admitted "evidence involving automobiles identical to the one involved in this case, which were suffering similar problems of fuel odors and leakage"); *Jones v. Otis Elevator Co.*, 861 F.2d 655, 662 (11th Cir. 1988) (although not identical, incidents involving a "malfunction in the normal stopping device" of other elevators were sufficiently similar). Further, as to Hernandez and Reinard, Crown does not expressly contend that the prior incidents are not substantially similar or too remote in time. Crown's motion to exclude evidence of prior incidents will be denied without prejudice. *See Moncrieffe*, 2008 WL 11333222, at *14 (allowing parties an opportunity to establish similarity between products and noting that admissibility "will also depend on the purpose the evidence is offered to show").

As for Petersen, to the extent Plaintiffs seek to admit his testimony to prove a design defect, Plaintiffs have not established that his incident is substantially similar to McHale's, and the potential for unfair prejudice and confusion substantially outweighs any probative value. Indeed, Petersen's incident involved a forklift manufactured by Raymond, not Crown. *See Wilson v. Bicycle S., Inc.*, 915 F.2d 1503, 1510 (11th Cir. 1990) (finding no abuse of discretion in excluding evidence due to the "necessity for a considerable amount of extrinsic evidence to determine whether the incidents were sufficiently similar"). However, as Plaintiffs observe, evidence that

injuries have been sustained by operators of forklifts without rear doors produced by other manufacturers may have probative value if Crown seeks to admit evidence that other manufacturers also produce forklifts without rear doors. (Dkt. 87 at 3-4 (conceding that, absent such evidence, "Petersen's testimony would not be admissible")). In summary, while Hernandez, Reinard, and Petersen may not testify as experts, Crown's motion as to their non-expert testimony is denied without prejudice.

## CONCLUSION

Plaintiffs' motions to admit the expert testimony of Meyer (Dkt. 73), Jeka (Dkt. 74), and Kerrigan (Dkt. 75), and Defendant Crown's motion to exclude expert testimony of Meyer (Dkt. 79) are **DENIED**. Crown's motion to strike and exclude expert testimony of Jeffress (Dkt. 83) is **GRANTED**. Consistent with the foregoing, the remaining motions are **GRANTED in part** and **DENIED in part**. (Dkts. 77, 78, 80, 81, 82, 92, 100, 101, 102).

**DONE AND ORDERED** this _28_ day of January, 2021.


JAMES D. WHITTEMORE
United States District Judge

Copies to: Counsel of record

28